**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
(NORTHERN DIVISION)**

| | | |
|---|---|---|
| **DRUANN L. MOORE,** | ) | |
| | ) | |
| **PLAINTIFF,** | ) | **Jury Demand as to All Counts** |
| | ) | |
| **v.** | ) | |
| | ) | **CIVIL ACTION NO. _____** |
| **LIFE INSURANCE COMPANY OF** | ) | 2:15-CV-187 |
| **NORTH AMERICA,** | ) | |
| | ) | |
| **DEFENDANT.** | ) | |

## COMPLAINT

1.     Druann L. Moore, hereafter the Plaintiff, is a resident of Elmore County, Alabama which is in the Middle District of Alabama.

2.     The Plaintiff began working for Baptist Medical Center South in July 1998, and then transferred to Baptist Medical Center East in 2007. Both hospitals are part of The Healthcare Authority for Baptist Health.   During her employment the Plaintiff was a participant in a long term disability plan (hereafter the Plan) established by The Healthcare Authority for Baptist Health (hereafter The Healthcare Authority or the Plan Sponsor).

3.     The Defendant, The Life Insurance Company of North America (hereafter LINA or the Defendant), provided a long term disability insurance benefit to all participants through the plan established by The Healthcare Authority.

4.     The Defendant does business by agent in the Middle District of Alabama

and all other counties in the state of Alabama.  It is incorporated in the state of Pennsylvania.

5.     Jurisdiction and venue is proper of the Middle District of Alabama.  There is more than $75,000 in controversy and the parties are diverse thus permitting diversity jurisdiction.

6.     The Plaintiff worked as a registered nurse for her employer which required her to provide patient care in a hospital setting.   This included the Plaintiff remaining on her feet for most of the shift, moving, lifting, and assisting patients regardless of their size; monitoring the vital signs of patients; correctly charting the information on each patient; and providing medication correctly to patients pursuant to doctors' orders.  She was also required to make beds, bathe and feed patients, sterilize instruments, prepare rooms for examinations by physicians or surgeons, make judgments and decisions regarding patient care, utilize precise set limits, tolerances and standards, function under emergency circumstances, perform effectively under stress and generally deal with people with a clear mind among other things.

7.     Over the course of her employment with The Healthcare Authority, the Plaintiff performed her job very well and received raises and promotions. However, in 2004 the Plaintiff began to have a difficult time controlling her

asthmatic symptoms.  Steroids were utilized to control the asthma, but this caused the Plaintiff to experience weight gain. The steroids were part of a treatment regimen to control recurrent bronchia spasms which incapacitated the Plaintiff without adequate warning. The Plaintiff missed time from work as a result of these issues.

8.    In 2005 the Plaintiff underwent some sleep studies, which resulted in adjustments to her care.  The Plaintiff believed her asthma was better controlled. She continued to work, but still missed time from work.

9.    In 2006 the Plaintiff again experienced severe debilitating bronchia spasms, and she was admitted to the hospital for acute exacerbation of her asthma.  After being discharged, the Plaintiff returned to work.

10.    The Plaintiff continued working until December 2007 when she began to experience more frequent problems with her asthma.  The severity of her problems left her unable to work for most days during December of 2007.  The severity of her pulmonary symptoms caused her fatigue and she could not remain on her feet for an entire shift.  Her cognition was also significantly impaired, falling below levels necessary for her to function as a nurse.  This was due to decreased oxygen to her brain.

11.    In 2008 the Plaintiff's episodes with asthma flare ups continued such that

3

she was missing excessive amounts of work and finally ceased full time employment as of March 18, 2008.

12.     The Plaintiff filed a claim for long term disability benefits under the Plan through the Defendant LINA. As of June 22, 2008 and after the elimination period of the plan, LINA found the Plaintiff disabled from performing her own occupation and approved the Plaintiff's claim for long term disability benefits. The Defendant paid the claim pursuant to the plan.

13.     The Plaintiff also filed a claim for Social Security Disability benefits and was immediately approved upon her initial application. An administrative hearing was not necessary. The Plaintiff's start date for Social Security benefits was May of 2008. Her date of disability was 5 full months prior to that date which included December of 2007. The Plaintiff's absences prior to her last month of full time work were so significant that the Social Security Administration considered her last significant active full time employment to be in November of 2007.

14.     In addition to her long term disability plan the Plaintiff also had a life insurance policy underwritten by LINA. LINA determined that the Plaintiff was disabled, and therefore decided to waive all premiums associated with her life insurance policy. However, as of October 2, 2008 LINA terminated the Plaintiff's premium waiver without showing any change in the Plaintiff's condition. LINA

4

claimed the Plaintiff was not disabled from performing full time work.

15.     The Plaintiff's asthmatic condition continued, and she remained incapable of full time work with the required continuity in a competitive job market. When she was having good days she was functional, unless she physically exerted herself or was exposed to an irritant. owever, physical exertion, perfumes, dust or changes in air condition, or coughing could trigger her asthma and cause her to be bed ridden or in need of emergency medical care.

16.     The Plaintiff desired to attempt to work at least part time and so she was permitted to do this by her employer. However, while working, the Plaintiff experienced asthmatic episodes with significant drops in her oxygen saturation levels. The Plaintiff was unable to work with any level of reasonable continuity as she could not predict when she would have an asthma attack with any level of reasonable certainty. She could not fulfill minimal obligations of working three days per week due to pulmonary dysfunction.

17.     In 2009, the Plaintiff's steroid medication was increased to better treat her asthma. As a result of the increase, however, she began hearing voices and experiencing delusions. The Plaintiff's psychotic episodes presented yet another obstacle to her maintaining the mental state and cognition necessary to function as a nurse.

18.    The Defendant continued to pay the Plaintiff's long term disability benefit during this time; however, it began to search for further information to use to deny the claim.

19.    As part of its search LINA sent the Plaintiff to Dr. G. Stauffer to perform what LINA called an "independent medical examination" (hereafter IME).   Dr. Stauffer examined the Plaintiff and opined that the Plaintiff was only suitable for some administrative type work from a remote location using electronic communication.  He provided that an example was to allow the Plaintiff to work, when she was physically able to work, from her home.  This opinion was based on the unpredictable nature of the Plaintiff's asthma attacks.

20.    Also, LINA conducted surveillance on the Plaintiff on February 11, 2010 the very day that the Plaintiff went to the IME appointment with Dr. Stauffer. However, the Plaintiff was only observed sitting in a vehicle as a passenger going to her appointment, and then walking into the appointment.

21.    Surveillance was conducted again on the Plaintiff on February 12, 2010, but the Plaintiff never left her home, which is fairly typical for the Plaintiff due to her severe, upredictable asthma attacks.  In fact, the Plaintiff experiences depression due to her limited ability to leave home.  Nonetheless LINA has continued to aggressively review the Plaintiff's claim.

22.    The Plaintiff's claim was paid until June 21, 2010  due to her inability to perform her own occupation.  As of June 22, 2010 the Plaintiff was found to be disabled from performing any occupation under the plan.  The claim was paid under this disability definition going forward.

23.    At this point in June of 2010, the Plaintiff still desired to remain in nursing part time at least.  She again sought aggressive treatment, but experienced excessive weight gain from steroid medication.  This worsened her condition.  She sought treatment for this weight gain and it was suggested that she have a gastric bypass surgery.  In 2010 the Plaintiff underwent this surgery and began to lose weight.  However, the Plaintiff continued to suffer hallucinations and pulmonary distress.

24.    By June of 2011 the Plaintiff had lost 105 pounds since her gastric bypass surgery, but her asthma continued to be very difficult to control.  The Plaintiff again attempted to work a few days each month, but unfortunately episodes would occur where the Plaintiff would suffer pulmonary distress including passing out at work.  Co-workers shook her to revive her and then took her to the emergency room.  This created anxiety for the Plaintiff and her co-workers as the Plaintiff could die while tending to a patient or cause harm to a patient. The Plaintiff had to cease regularly scheduled work again.

25.    The Plaintiff was depressed over her condition and attempted to engage in activities that might bring some enjoyment such as a trip to the beach. However, when the Plaintiff did go to the beach she had to be taken to the emergency room while there due to an acute asthma attack. As a result it was necessary yet again to increase her steroid dosage.

26.    During this time LINA continued to pay the Plaintiff's long term disability claim, but again paid for more surveillance in an effort to find a reason to deny the Plaintiff's claim.

27.    On September 14th, 2011 the Defendant terminated the Plaintiff's claim and contended that no restrictions were received from her attending physician. However, this was false as restrictions were actually received on September 13, 2011.

28.    LINA apparently mindful that its decision was suspect again conducted surveillance on October 30th and 31st, 2011, but did not see the Plaintiff engaged in any activity.

29.    Benefits were temporarily reinstated but, On November 9, 2011 the Defendant required the Plaintiff to go to a functional capacity evaluation (FCE). This was nonsensical since her condition was asthma. The Plaintiff complied nonetheless and unfortunately the physical exertion caused the Plaintiff to

8

experience an asthma attack during the FCE activities. This caused the FCE to terminate and the Plaintiff had to seek immediate medical attention.

30.    On November 10th and 11th, 2011 surveillance of the Plaintiff was again conducted by LINA, but the Plaintiff was only seen walking her dog one of these days for a very short distance. This did not establish her ability to work as a nurse or in any other relevant occupation. Surveillance was conducted again by the Defendant on November 15th and 16th, 2011, but again there was no activity observed by the Plaintiff.

31.    Surveillance of the Plaintiff was again conducted by LINA on November 21, 2011. The Plaintiff was seen walking a short distance to her mailbox and then returning inside her home. Again on November 30, 2011 surveillance of the Plaintiff was conducted by LINA, but she was not seen outside her home.

32.    The Plaintiff appealed LINA's termination of her long term disability claim and submitted a letter from her pulmonologist in support of her appeal. He opined that the Plaintiff was functional when well; however, she had restrictions from working because of unpredictable asthma attacks. It was noted that whenever the Plaintiff attempted to work outside her home her asthma was exacerbated and this required her to go back on high doses of corticosteroids. High doses of steroids posed problems for the Plaintiff with excessive weight gain and psychotic episodes

9

including hallucinations.

33.     The Defendant had a special investigation unit within its company evaluate the claim and a report was prepared.  It was recommended that the Plaintiff's benefit claim be reinstated.  Additionally a nurse employee of the Defendant stated on January 4, 2012 that the instability of the Plaintiff's pulmonary status and frequent hospitalizations along with steroid dependency provided supported restrictions and continued payment of benefits.  On or about January 13, 2012 the Defendant again commenced paying the Plaintiff's benefit.

34.     In February 2012, the Plaintiff advised the Defendant that she was attempting to work two days per month because of the aggravating issues that occurred with the Plaintiff's asthma.  The Plaintiff continued her efforts to try and work part time as a nurse teacher, but finally was not able to do this with the necessary continuity as of April 2012.

35.     The Plaintiff's medical condition declined while she was working.   In addition to her previous complication from poorly controlled asthma, she also began suffering memory loss and hot flashes.  Her treating physician had no remedy to allow her to continue to work two days per month.

36.     Thereafter the Defendant again conducted surveillance on the Plaintiff for three days straight on July 24th, 25th and 26th of 2012, but did not find the Plaintiff

outside of her home. Again, the Defendant conducted surveillance on the Plaintiff on September 17th, but it did not find the Plaintiff engaged in any significant activity. On the 18th the Plaintiff was observed going to a doctor's appointment and eating outside her home and conversing with another person. Again, on the 19th of September 2012 surveillance was conducted, but the Plaintiff was not seen outside her home.

37.    The Defendant LINA however did not give up on trying to terminate the Plaintiff's claim and so conducted further surveillance on December 17th, 18th and 19th of 2012. No activity was reported other than on the 18th of December and that was the date that the Defendant had required the Plaintiff to go to another IME. The Plaintiff was observed being driven as a passenger to and from the IME appointment.

38.    The Defendant had hired Dr. Goldstein to conduct the IME. At the IME on December 18, 2012 Dr. Goldstein opined that the Plaintiff was totally disabled as she could have an acute asthmatic episode at any time. He further noted that past episodes had required CPR and reviving of the Plaintiff as well as emergency admission to the hospital. This was documented in medical records.

39.    LINA was displeased with the IME report, and so it sent repeated requests for information to Dr. Goldstein in January of 2013 in an effort to try to have Dr.

Goldstein change his opinion but to no avail.

40.     During February of 2013 the Plaintiff again attempted to go on a vacation given her despair over her condition. The Plaintiff flew to the Bahamas and was attended by her boyfriend on a flight of approximately 1 ½ hours. The Plaintiff was required to take four conservation oxygen regulators/02 conservator tanks and her nebulizer on this trip to control her asthma and hopefully avoid the possibility of a medical emergency. The Plaintiff was in fact required to utilize a nebulizer while on the plane and again on the plane trip home. The Plaintiff was also required to use the oxygen while at her hotel room in the Bahamas, and was not able to engage in any significant activities other than to experience the change in scenery.

41.     The Plaintiff freely shared this information to the Defendant. However, this angered the Defendant as it perceived that no disabled person should be permitted to go to the Bahamas.

42.     Surveillance was again conducted on April 8th, 9th, and 10th of 2013. The video surveillance was a mere 23 minutes of video gathered over the course of three entire days. It showed the Plaintiff was walking, entering and exiting a vehicle, driving, sitting in a vehicle, consuming food and conversing with an unidentified male near her home. None of this short activity was inconsistent with

12

any of the restrictions and limitations reported by the Plaintiff.

43.    In a May 8, 2013 letter to Dr. Goldstein LINA sought to deceive Dr. Goldstein to induce him to change his opinion.

44.    LINA was very angered that the IME performed by Dr. Goldstein reflected that the Plaintiff was indeed disabled from performing any full time occupation with reasonable continuity.  Therefore, LINA contrived a plan using its nurse case manager to selectively submit certain pieces of evidence and information to try to anger Dr. Goldstein in hopes he would change his opinion.

45.    LINA's letter related to Dr. Goldstein that surveillance was performed on multiple occasions which had been "previously supplied" to him for review with the IME. This was not true. Dr. Goldstein did not have all of the surveillance, the vast majority of which showed no activity by the Plaintiff.  Rather, only one short segment of surveillance was provided to him.  He was not furnished the weeks of surveillance reflecting no activity.  In the short video the Plaintiff was not observed having severe respiratory difficulties or observed shortness of breath.  She was observed driving, eating out at a restaurant and walking briefly.  It was also reported to Dr. Goldstein that the Plaintiff went to the Bahamas in 2013.  The paragraph was intentionally worded so as to mislead Dr. Goldstein into believing that the Plaintiff was observed vacationing in the Bahamas by video surveillance

without any difficulties.

46.    This letter made false and intentionally misleading statements.  It led Dr. Goldstein to believe that the Plaintiff had more capacity to work, that the video was a fair sampling of the Plaintiff's daily activity and that she was capable of engaging in these activities in the Bahamas.

47.    Dr. Goldstein then opined, without examining the Plaintiff, that one would presume that this patient had no respiratory symptoms.  He stated however that it must be carefully considered whether or not "exposure to irritants will cause an acute asthmatic attack".  LINA again refused to pay the Plaintiff's long term disability claim ignoring the concern posed over an acute asthmatic attack, and again terminated benefits on June 21, 2013.

48.    This termination occurred despite the fact that LINA knew that physical exertion during the course of the FCE had lead to a respiratory attack and that two independent exams of the Plaintiff, a special investigation unit report, and prior decisions all supported paying this claim.  Further, LINA knew that the Plaintiff's repeated efforts at part time employment had failed.  LINA knew it was impossible for the Plaintiff to work in any workplace without physically exerting herself or being exposed to some irritant.  Nonetheless LINA disregarded the facts and denied the claim.  This caused mental distress and anguish for the Plaintiff.

49.    The Plaintiff appealed LINA's wrongful termination of benefits and pointed out the selective and unfair review that had been conducted.  The date of the appeal submission was December 18, 2013.  Substantial evidence of eyewitness accounts of the Plaintiff's asthma attacks was presented along with further medical records.

50.    The Defendant delayed determining the claim past the time permitted by its policy.  A decision was due on or about February 1, 2014, but no decision was made on that date.  Instead, LINA began to send letters saying that an extension was required without specifying what special circumstances required the extension as required by the policy.  LINA also began a practice of either back dating letters or mailing them belatedly.

51.    A letter from LINA dated January 2, 2014 did not have a postage meter stamp affixed to it until January 6, 2014 and therefore could not have been mailed before that date.  The letter was received several days after January 6, 2014.  A letter dated January 27, 2014 had a postage meter stamp dated January 30, 2014. Another letter dated January 30, 2014 from LINA did not have a postage meter affixed to it until February 3, 2014.  Further a letter dated February 10, 2014 from LINA also did not have a postage meter mark affixed until February 13, 2014. Another letter dated February 21, 2014 did not have a postage meter mark affixed to it until February 25, 2014.  There was a pattern of LINA backdating or delaying

in mailing its letters.

52.    On February 25, 2014 the Plaintiff faxed a letter to LINA indicating that the time for deciding the claim was past per the policy. LINA then sent a response letter purporting to make a decision. The letter was dated February 28, 2014, with a postage meter mark on the envelope dated March 4, 2014. This letter was not received until approximately five days after March 4th, in fact. The claim was not timely decided, and the letter was not timely mailed. LINA violated its policy terms with its late response.

53.    After refusing to pay the claim, LINA then sought to retaliate against the Plaintiff and force her to cease pursuing her claim. LINA hired a collection firm called Brown & Joseph to contend that LINA had made a mistake five or six years previously and that the Plaintiff actually owed the Defendant $34,507.96. Legal action was threatened if the Plaintiff did not repay the monies. The Plaintiff disputed LINA's contention that she owed an overpayment, but nonetheless further collection efforts persisted against the Plaintiff. This caused mental distress and anguish for the Plaintiff.

54.    Finally after the Plaintiff incurred significant attorney fees to refute this wrongful effort to attempt to "redo" claim calculations going back five or six years in violation of the policy time frames for decisions, the Defendant dropped its

16

overpayment effort and retracted the same by way of a letter dated June 23, 2014.

55.     After the Defendant refused to reinstate the Plaintiff's long term disability benefits, Plaintiff's counsel obtained a copy of the claim file and found that there had been misleading information given to the doctor performing the IME, Dr. Goldstein.  It was noted that the trip to the Bahamas was misleading as LINA failed to report the accommodations that were required and necessary both on the short flights and while in the Bahamas.  It was also further noted there was far more video surveillance conducted than was actually provided to Dr. Goldstein.

56.     The withheld claim file documentation was provided to Dr. Goldstein, and he was requested to comment on this.  Dr. Goldstein requested that we provide all medical records.  He also wanted to review all the information and perform an evaluation of the Plaintiff.

57.     After Dr. Goldstein's evaluation of the Plaintiff again, and after personally physically examining her, and reviewing all of the medical records and recent documentation in the claim file, he opined on several matters.  He stated that as to his letter of May 13, 2013, his comment that the Plaintiff "might be able to do some work", included the comment "that the issue of acute episodes and the non specific bronchial hyper–responsiveness could change that opinion."  He stated that his opinion was that based on the mere 23 minutes of video her physical

17

abilities demonstrated that she could work in that video, but he knew she could not work while having any asthma attacks.

58. Dr. Goldstein further noted that "based on this lady's history, the video information could very well have been obtained on a day when she was "doing well". He opined that the problem is that she has no warning when she can have an attack and her attacks can be very serious and severe and can lead to emergency room visits.

59. He concluded "Ms. Moore is totally disabled from gainful employment. She cannot return to her job as a nurse nor could she return to any job because of the unpredictability of the symptoms and acute episodes." This information was submitted to LINA.

60. A vocational evaluation regarding the spasmodic ability of the Plaintiff to work was performed and she was found to be disabled from any form of gainful employment. This was also submitted to LINA.

61. Information reflecting inconsistent decision making was submitted to LINA. However, LINA, having the clear opportunity to rectify its bad faith and wrongful conduct, again refused to pay the claim or reinstate the Plaintiff's benefits.

62. Due to the inconsistent and wrongful actions of the Defendant the Plaintiff had no choice but to proceed with litigation. The Defendant has acted

inconsistently and improperly disregarding evidence which is undisputed and it has violated its fiduciary duties.

63.    The Defendant also has refused to produce documentation relevant to the level of its bias relating to claim history regarding other asthma claimants, any reward programs for its adjusters in which the Defendant encourages them to deny claims, interpretation of this particular policy and other cases, and provision of its claim manual to allow the Plaintiff to make some sense of the inconsistency regarding LINA's decision making.

64.    The actions of the Defendant exhibit bad faith and a disregard of fiduciary duties and that the Defendant has not acted in the best interest of plan participants, but rather in its own self serving interest being guided by its profit motive.  It spent so much on surveillance, the IMEs, and doctor reviews until the Defendant became vested in terminating the claim to justify the expense.

65.    The Plaintiff has suffered mental anguish as a result of the egregious conduct of the Defendant in causing her harm and anxiety, forsaking its fiduciary duties and wrongfully denying the Plaintiff's claim despite the fact that the evidence is overwhelming that she cannot work with any level of reasonable continuity.

66.    Furthermore, the actions of the Defendant are egregious to the extent that an

award of punitive damages under state law is warranted and claimed.

67.    The Plaintiff has exhausted all policy claim remedies and has given the Defendant full opportunity to correct its wrongs.

**COUNT ONE**

**BREACH OF INSURANCE CONTRACT**

68.    The Plaintiff incorporates by reference all prior paragraphs of this complaint.

69.    The Healthcare Authority, for the benefit of the Plaintiff and others, entered into a contract of insurance with the Defendant to provide coverage for the Plaintiff's inability to work full time with reasonable continuity and for life insurance.

70.    The Defendant breached the Plan terms and insurance contracts as set forth above.

71.    The contract concerned matters of mental solicitude. They pertained to the Plaintiff's peace of mind knowing that if she could not work, she had some financial source to pay bills, keep her life insurance and survive in place.  The Plaintiff also believed that once benefits were approved, and as long as ongoing proof was furnished, the claims would be fairly handled and the claim paid.

72.    As a result of the Defendant's breaches the Plaintiff has suffered damages flowing from the breaches, including the loss of insurance benefits, interest on

those benefits and mental anguish. The Plaintiff has suffered consequential damages in depleting other financial resources to survive and pay bills.

73. The Plaintiff demands mental anguish damages, benefits due, and interest on all of the damages flowing from that breach.

**WHEREFORE**, the Plaintiff demands judgment against the Defendant for all sums that should have been paid under the Plan and contracts together with interest, mental anguish damages in excess of $75,000, reinstatement of all benefits, court costs, and other such damages and equitable relief as may be provided by law and in such sums as a jury and Court may assess.

## COUNT TWO

## BAD FAITH

74. The Plaintiff incorporates, by reference, all previous paragraphs of this complaint.

75. The Defendant had a duty of good faith in the performance of the Plan terms and its insurance contracts covering the Plaintiff.

76. The Defendant further had a duty to exercise ordinary diligence in the performance of the insurance contract.

77. The Defendant further had a duty to investigate the circumstances of the Plaintiff's claim under the insurance contract.

78.   The Defendant breached its duty of good faith and/or its duty to exercise ordinary diligence and/or its duty to investigate.

79.   Further, the Defendant has not engaged in fair dealings with the Plaintiff in connection with this insurance policy.

80.   Under the terms of the contracts, the Defendant was obligated to pay the Plaintiff's claims and in fact, it had previously paid the Plaintiff's claim.

81.   The Defendant unfairly and intentionally refused to pay the Plaintiff's claims, and made decisions in conflict with previous decisions.

82.   There is no reasonably legitimate, arguable or debatable reason for that refusal to pay and there is no reason for a dispute or question as to the Defendant's refusal to pay the claims.

83.   The Defendant also contrived reasons not to pay the claims, and appears to have "doctor-shopped" until it found a reviewer willing to give the opinion it wanted in order to deny the claim. This was in conflict with the Defendant's own procedures to give greater weight to its own IME.

84.   The Defendant had actual knowledge that there was no reasonably legitimate, arguable or debatable reason not to pay the claim. The Defendant has engaged in a pattern and practice of this conduct by denying claims without a basis to force individuals to submit unnecessary information to delay matters. The

Defendant spent such significant sums to effect a denial of the claim that it lost any objectivity and became determined to deny the claim to justify the expense incurred.

85.    The actions of the Defendant constitute bad faith.

86.    The Plaintiff has suffered damages as a result of the Defendant's bad faith including mental anguish damages.

87.    The Plaintiff claims punitive damages against the Defendant, as there is clear and convincing evidence the Defendant consciously or deliberately engaged in wantonness and/or a gross reckless, conscious disregard of its obligations to pay a lawful claim in a timely manner.

88.    The Plaintiff also claims mental anguish damages arising from the bad faith and arising from the breach of the contractual duties involved, which concerned solicitude and mental concern.

**WHEREFORE**, the premises considered the Plaintiff requests damages in excess of $250,000 against the Defendant in the form of compensatory damages, mental anguish damages, punitive damages and such other equitable and just relief in such sums as a jury or this Court may award.

David P. Martin
(ASB-3500-M68D)

Ariel S. Blocker
(ASB-0090-Z82A)
**The Martin Law Group, LLC**
**Attorneys for Plaintiff**
P.O. Box 20087
Tuscaloosa, AL 35402
Phone (205) 343-1771
Facsimile (205) 343-1781
Davidpmartin@erisacase.com
ariel@erisacase.com

**Plaintiff's Address:**

Druann Moore
c/o The Martin Law Group, LLC
P.O. Box 20087
Tuscaloosa, AL 35402

**Defendant's Address:**

Life Insurance Company of North America
C/O CT Corporation System
2 North Jackson Street, Suite 605
Montgomery, AL  36104

## JURY DEMAND

The Plaintiff demands trial by struck jury on all counts of this Complaint.

**David P. Martin (ASB-3500-M68D)**

24